[Cite as *State v. Hargrove*, 2026-Ohio-2728.]

# IN THE COURT OF APPEALS OF OHIO

SEVENTH APPELLATE DISTRICT
MAHONING COUNTY

STATE OF OHIO,

Plaintiff-Appellee,

v.

AKEEM MALIK HARGROVE,

Defendant-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
Case No. 25 MA 0097

---

Criminal Appeal from the
Court of Common Pleas of Mahoning County, Ohio
Case No. 2023 CR 00027

**BEFORE:**
Cheryl L. Waite, Mark A. Hanni, Katelyn Dickey, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. Elliot J. Kolkovich*, Special Prosecuting Attorney, and *Atty. C. Richley Raley Jr.*, Special Assistant Prosecuting Attorney, for Plaintiff-Appellee

*Atty. Stanley T. Booker* and *Atty. Melanie F. Womer*, Law Firm of Stanley T. Booker, for Defendant-Appellant

Dated: July 13, 2026

---

**WAITE, P.J.**

**{¶1}** Appellant Akeem Malik Hargrove appeals from a Mahoning County Common Pleas Court judgment convicting him of aggravated murder with an accompanying firearm specification following a jury trial. Appellant argues on appeal that his conviction was against the manifest weight of the evidence; the trial court improperly excluded evidence that could have shown that the police did not conduct a thorough investigation; the trial court failed to exclude prior bad acts evidence; and that the trial court erred in denying his motion for a new trial. His contentions as to the weight of the evidence and the other evidentiary issues are not supported by the record or by law and are overruled. Appellant's assignment of error regarding his motion for a new trial is overruled on the basis that the motion was filed late. Appellant's motion, based on jury misconduct, was required to be filed within 14 days of the verdict. Crim.R. 33(A)(2). The motion was filed well after the 14-day deadline. Appellant neither argued nor offered evidence that he was unavoidably prevented from filing his motion within 14 days, and thus, the trial court correctly dismissed the motion. As none of Appellant's assignments of error have merit, his conviction and sentence are affirmed in full.

<u>Facts and Procedural History</u>

**{¶2}** On January 19, 2023, a Mahoning County Grand Jury indicted Appellant on charges of aggravated murder, an unclassified felony in violation of R.C. 2903.01(A) and R.C. 2929.02(A) with an accompanying firearm specification (Count 1), and murder, an unclassified felony in violation of R.C. 2903.02(A)(D) and R.C. 2929.02(B) also with an accompanying firearm specification (Count 2). On July 19, 2024, a Mahoning County

Grand Jury issued a superseding indictment. This superseding indictment did not affect Appellant's charges, but added identical charges against co-defendant Zachary Bair.

{¶3}    The matter proceeded to a jury trial on August 11, 2025.

{¶4}    The victim of the crime was D.B. According to D.B.'s mother and his girlfriend, Appellant and D.B. had been close friends for many years. It was not until the fall of 2022 that the two had a falling out.

{¶5}    According to Appellant's friend Arelis Jankovich, on the evening of December 21, 2022, Arelis picked up Appellant and brought him to her house on the south side of Youngstown so the two could eat and "hang out." (August 11, 2025 Trial Transcript, hereinafter "Tr.," 459.) Sometime later, Zachary Bair, dressed in black and wearing a mask, arrived at Arelis's house and Appellant let him into the house. Bair visited for a period before purchasing some marijuana from Appellant. Bair used a kitchen knife with a teal-colored handle taken from a block of knives on Arelis's counter to cut open the bag of marijuana. Bair then put the knife in his pocket.

{¶6}    Arelis stated that Appellant and Bair left the house together in her Jeep Cherokee. Appellant drove the Jeep even though Arelis had told him not to take it that evening. According to Bair, after driving around Youngtown, he and Appellant were travelling on South Avenue when Appellant spotted a Chevy Cruze vehicle in the parking lot of a Shell gas station. Upon seeing D.B. in the Cruze, Appellant said, "there go that motherfucker right there." (Tr., p. 674.) Appellant then drove around the corner and parked in a driveway on a side street. He asked Bair if he "was with him" and pulled out a gun from his waistband. (Tr., p. 678.) Bair understood that he and Appellant were going to shoot the person in the Cruze. The two got out of car and walked to the Shell

station with their guns in their hands. When they reached the car, Bair and Appellant "shot the car up." (Tr., p. 686.)

{¶7} Bair said the two ran through a field and back to the Jeep. While running, Bair dropped the knife from Arelis's kitchen and his .45 firearm in the field. The two made it back to the Jeep and left the scene. Appellant drove them back to Arelis's house and Appellant told Bair, "[d]on't tell his girl then." (Tr., p. 699.) Bair got into his car and left.

{¶8} According to Arelis, when Appellant returned to her house his body language was "completely off." (Tr., p. 475.) She testified Appellant was clenching his jaw and pacing. When she asked Appellant what was wrong, Appellant told her he had killed D.B. and it was on the news. Appellant told Arelis that D.B. had stolen money from him a few months prior and "it wasn't sitting right with him." (Tr., p. 476.) Arelis testified that Appellant asked for bleach and then cleaned himself up before leaving.

{¶9} Officer Stephen Gaetano responded to the scene of the shooting. When he arrived at the gas station, the officer found the Chevy Cruze parked in a parking spot. D.B. was seated in the driver's seat and appeared to have been shot. The driver-side window was shattered and there were spent shell casings on the ground near the car. D.B. suffered nine gunshot wounds and died as a result of his injuries.

{¶10} During jury deliberations, Juror 8 asked to speak to the judge. Juror 8 brought to the court's attention that one of the other jurors made a threatening remark towards him. Juror 8 said, "It was - - he was joking, but it was - - it was threatening." (Tr., p. 1127.) The court asked Juror 8 if he could continue to be fair and impartial, to fairly listen to the other side, and to hold on to his convictions. Juror 8 responded, "I'm struggling holding on to my conviction because I do feel threatened." (Tr., p. 1131). The

court then spoke with each of the other jurors. They all indicated that they could be fair and impartial and were comfortable remaining on the jury. (Tr., pp.1133-1158). After further research and discussion with counsel, the judge dismissed Juror 8 and replaced him with an alternate juror.

{¶11} The jury ultimately found Appellant guilty of both charges and the firearm specifications.

{¶12} The trial court set the matter for sentencing on September 18, 2025. That day, Appellant filed a motion for new trial. He alleged there was no direct evidence of his involvement in the murder. Instead, Appellant argued, all of the direct evidence indicated that he was innocent. Appellant also argued that he was prejudiced by juror misconduct.

{¶13} The trial court held the sentencing hearing as scheduled on September 18, 2025. Appellant was sentenced to life in prison without parole on Count 1 plus three years on the attendant firearm specification. The court found that Count 2 merged with Count 1 for purposes of sentencing, but imposed three years on the firearm specification.

{¶14} Appellant filed a timely notice of appeal on October 17, 2025. On November 6, 2025, this Court issued a limited remand so that the trial court could rule on Appellant's motion for a new trial.

{¶15} The trial court held a hearing on the motion on November 6 and 17, 2025. It subsequently denied Appellant's motion for a new trial, and we returned the case to our active docket.

{¶16} Appellant now raises four assignments of error for our review. We address his second assignment of error out of order for ease of discussion.

{¶17} In Appellant's second assignment of error he states:

APPELLANT'S CONVICTIONS WERE AGAINST THE WEIGHT OF THE EVIDENCE IN VIOLATION OF HIS RIGHT TO DUE PROCESS AS GUARANTEED UNDER THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE 1, SECTION 10 OF THE OHIO CONSTITUTION.

**{¶18}** In this assignment of error, Appellant asserts his convictions are against the manifest weight of the evidence.

**{¶19}** The jury convicted Appellant of aggravated murder in violation of R.C. 2903.01(A), which provides in relevant part: "No person shall purposely, and with prior calculation and design, cause the death of another[.]" It also convicted him of murder in violation of R.C. 2903.02(A), which states in pertinent part: "No person shall purposely cause the death of another[.]"

**{¶20}** In determining whether a verdict is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences and determine whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Thompkins*, 78 Ohio St.3d 380 (1997). "Weight of the evidence concerns 'the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other.'" *Id.* at 387, quoting *Black's Law Dictionary* (6 Ed.1990) In making its determination, a reviewing court is not required to view the evidence in a light most favorable to the prosecution but may consider and weigh all of the evidence produced at trial. *Id.* at 390.

**{¶21}** Granting a new trial is only appropriate in extraordinary cases where the evidence weighs heavily against the conviction. *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983). This is because determinations of witness credibility, conflicting testimony, and evidence weight are primarily for the trier of the facts who sits in the best position to judge the weight of the evidence and the witnesses' credibility by observing their gestures, voice inflections, and demeanor. *State v. Rouse*, 2005-Ohio-6328, ¶ 49 (7th Dist.), citing *State v. Hill*, 75 Ohio St.3d 195, 205 (1996); *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967). Thus, "[w]hen there exist two fairly reasonable views of the evidence or two conflicting versions of events, neither of which is unbelievable, it is not our province to choose which one we believe." *State v. Dyke*, 2002-Ohio-1152 (7th Dist.).

**{¶22}** Only when "it is patently apparent that the factfinder lost its way," should an appellate court overturn the jury verdict. *State v. Woullard*, 2004-Ohio-3395, ¶ 81 (2d Dist.). If a conviction is against the manifest weight of the evidence, a new trial is to be ordered. *Thompkins*, 78 Ohio St.3d at 387. "No judgment resulting from a trial by jury shall be reversed on the weight of the evidence except by the concurrence of all three judges hearing the cause." *State v. Miller*, 2002-Ohio-4931, ¶ 36, quoting Ohio Const., art. IV, § 3(B)(3).

**{¶23}** Considering the evidence in light of the above standards, Youngtown Police Officer Stephen Gaetano testified that he responded to a call of a shooting at the Shell station on South Avenue. (Tr., p. 331.) He found a male, who appeared to have been shot, in the front seat of a Chevy Cruze. (Tr., p. 333.) The male was identified as D.B. (Tr., p. 335.)

{¶24} Youngstown Police Officer Jacob Short worked with a K-9 partner named "Spawn." (Tr., p. 342.) Officer Short and Spawn were called to the scene of the shooting. (Tr., p. 343.) The officer was informed that two subjects ran from the scene up a side street and into a field. (Tr., pp. 343-344.) Officer Short testified that Spawn was able to locate a scent trail. (Tr., p. 344.) The officer followed Spawn for about half a block and into a field. (Tr., p. 345.) Spawn was able to lead the officer to a firearm that had been abandoned in the field. (Tr., p. 345.) In his continued search, Spawn led Officer Short to a teal-handled knife, also in the field. (Tr., p. 346.) After finding these two items, Spawn continued to search, but then lost the scent trail. (Tr. p. 346.)

{¶25} Youngstown Police Officer Greg Miller took photographs of various items involved in the investigation of this case, including several items in Arelis's house. Officer Miller photographed a block of kitchen knives in Arelis's kitchen. (Tr., p. 374; Exh. 67.) The officer testified that the knives in the kitchen block had turquoise green handles, which were "very similar" to the handle of the knife found by Spawn in the field. (Tr., p. 374.)

{¶26} Officer Miller also testified that 11 spent shell casings were recovered from the scene at the Shell station. (Tr., p. 380.) Of these spent casings, five were .45 caliber and six were 9mm. (Tr., pp. 380, 383-384; Exh. 74.) Officer Miller also identified the firearm found in the field as a .45 caliber Glock model 21. (Tr., p. 391.)

{¶27} The victim's mother testified that her son D.B. and Appellant were very close friends until October or November of 2022. (Tr., pp. 406-407.)

**{¶28}** D.B.'s girlfriend, Ebony, stated that from November 2021 to August 2022, D.B. was in prison for a parole violation. (Tr., pp. 437-438.) Ebony also testified that D.B. and Appellant had been close friends until September or October of 2022. (Tr., p. 439.)

**{¶29}** Arelis had a relationship with Appellant. Arelis lived on West Judson Street on Youngstown's south side with her children and drove a burgundy Jeep Cherokee at the time in question. (Tr., p. 458.) On the evening of the killing, Arelis picked Appellant up and drove him to her house to eat and spend some time. (Tr., pp. 459-460.) At some point, another man showed up at Arelis's house. (Tr., p. 461.) Appellant, not Arelis, let the man into the house. (Tr., p. 462.) Arelis stated that the man was "masked up", so she did not see his face. (Tr., p. 462.) She testified he wore a ski mask that "they wear for fashion now." (Tr., p. 462.) Arelis did not find this particularly strange because "everyone was doing it then." (Tr., p. 462.) Arelis left Appellant and the other man in her kitchen and went into another room. (Tr., p. 463.) Shortly after, Appellant and the other man left in her Jeep even though she had told Appellant not to take her vehicle. (Tr., pp. 464-465.) Arelis testified that she called Appellant numerous times to tell him to bring her vehicle back, but he did not answer. (Tr., pp. 466, 470.)

**{¶30}** Arelis then called her friend, William Burton, who is a Youngstown Police Officer. (Tr., pp. 466-467.) She told him that something seemed "off," and asked if, should he see her vehicle on the roadway, he would pull the driver over and let her know. (Tr., p. 467.) Arelis testified that when Appellant left she could tell "he wasn't in the right state of mind" and "his whole demeanor and body language was off." (Tr., p. 467.)

**{¶31}** At trial, the prosecutor asked Arelis about the phone calls she made, noting that her phone records from AT&T were marked as an exhibit. (Tr., pp. 468-469; Exh. 8.)

Case No. 25 MA 0097

Arelis said that she had called 911 at 11:19 p.m. regarding her vehicle, but that she never talked to anyone and decided to hang up. (Tr., p. 470.) She called and spoke with Officer Burton at 1:29 a.m. (Tr., p. 472.) Additionally, she called Appellant multiple times both before and after calling Officer Burton but Appellant never answered. (Tr., pp. 472-473.) Her last attempted call to Appellant was at 2:01 a.m. (Tr., p. 474.) Arelis stated that shortly after that call, Appellant returned to her house. (Tr., p. 475.)

{¶32} Arelis noticed that when Appellant walked into her house, his body language was "completely off." (Tr., p. 475.) She testified Appellant "was clenching his jaw, he was pacing, he didn't seem right." (Tr., p. 475.) Arelis asked Appellant what was wrong. (Tr. 475). Appellant told her he had killed D.B. and it was on the news. (Tr., pp. 475-476). Appellant told Arelis that D.B. had stolen money from him a few months prior and "it wasn't sitting right with him." (Tr., p. 476.) Arelis stated that Appellant asked for bleach and then cleaned himself up. (Tr., p. 476.) Shortly after, Appellant left. (Tr., pp. 476-477.) Before he left, Arelis chastised Appellant for taking her vehicle, in which she transports her children, to commit a murder. (Tr., p. 477.) Appellant told her not to worry because the vehicle was parked several blocks away from the scene. (Tr., p. 477.) Arelis also stated that Appellant told her he had "smashed" cell phones belonging to her and her daughter in her basement, telling her she needed to get rid of them. (Tr., p. 478.)

{¶33} After Appellant left, Arelis did not feel comfortable in her house. (Tr., p. 478.) She said that she did not want to drive her Jeep, so she left it in the garage. (Tr., p. 479.) A friend picked her and her children up. (Tr., p. 479.) Arelis testified that Officer Burton later picked her up from somewhere in Weathersfield. (Tr., p. 480.) She told him what Appellant had confessed to her. (Tr., p. 480.) Officer Burton advised Arelis that she

needed to make a police report. (Tr., p. 480.) Officer Burton drove her to the police station, where she was questioned and made a report. (Tr., p. 481.)

{¶34} Arelis went home after leaving the police station, accompanied by several detectives who took some photographs at her house. (Tr., p. 482.) Arelis testified that she has a wooden block of knives on her kitchen counter. (Tr., pp. 482-483.) The knives have teal-colored handles. (Tr., p. 482; Exh. 66.) Arelis identified the knife found in the field as one missing from her knife block. (Tr., p. 483; Exh. 83.) She also identified photographs a detective took of bleach located under her sink. (Tr., p. 486; Exh. 69.)

{¶35} On cross-examination, Arelis stated that she owns a teal and silver 9mm firearm. (Tr., p. 502.) However, this firearm remained in her home the entire time. (Tr., 503.) Arelis also testified that D.B. had reached out to her a few days prior to the murder and said something that offended her. (Tr., pp. 510-511.) While she had testified that she did not have her phone on December 22 when she went to the police station, (Tr., p. 521) her phone records showed calls were made during that morning up until 7:00 a.m. (Tr., pp. 522-523.) Additionally, Arelis stated that she had never seen Appellant with Bair before that night. (Tr., p. 534.)

{¶36} Officer Burton testified that Arelis called him at 1:29 a.m. on December 22, 2022, while he was working. (Tr., p. 571.) She was upset because Appellant took her car and was not answering his phone. (Tr., pp. 568-569.) Officer Burton advised Arelis to wait and see if Appellant returned her car later that morning and, if not, to file a police report. (Tr., p. 569.) Later that morning, after the officer was home, Arelis called Officer Burton again. (Tr., p. 571.) Arelis was "absolutely hysterical." (Tr., p. 571.) She blurted out to Officer Burton that her boyfriend had killed someone and had used her car. (Tr.,

p. 571.) Officer Burton told Arelis to come to his house. (Tr., p. 572.) In the meantime, the officer called his supervisor, a Youngstown Police lieutenant, to report Arelis's disclosure. (Tr., p. 572.)

{¶37} The officer testified that Arelis did arrive at his house with her children. (Tr., p. 572.) She agreed to go to the police station to give a statement. (Tr., p. 572.) He testified that his involvement in this matter was as a friend to Arelis; he was not assigned as an officer on this case. (Tr., p. 574.)

{¶38} Jenna Kolb is a forensic scientist in the latent print unit at the Ohio Bureau of Criminal Identification and Investigation (BCI). She examined the knife found in the field and concluded it contained no fingerprints. (Tr., pp. 593-594.)

{¶39} Brittani Troyer is a forensic scientist in the DNA unit at BCI. She tested DNA swabs taken from various areas of Arelis's vehicle, and the firearm and knife that were recovered in the field, and compared them to samples from Appellant, Arelis, and Bair. Troyer testified the firearm contained DNA from an unknown male and some "leftover" DNA, which was insufficient for her to compare. (Tr., pp. 610-611.) Troyer stated the knife had insufficient DNA for comparison. (Tr., pp. 612-613.) The DNA recovered from the steering wheel of Arelis's car showed that Arelis's DNA was the major profile and that some other DNA was leftover and was not sufficient to compare. (Tr., p. 614.) DNA from the gear shift was not sufficient for comparison. (Tr., p. 615.) DNA from the driver's interior door pull showed a mixture of DNA, with a major contributor being an unknown male. (Tr., p. 615.) Finally, Troyer testified that DNA recovered from the firearm in the field showed that Bair was a major contributor. (Tr., p. 617.)

{¶40} Joshua Barr is a forensic scientist in the firearm unit at BCI. He examined the bullets, casings, and firearm recovered in this case. Barr testified that three of the bullets recovered from D.B.'s body were fired from the .45 Glock firearm recovered from the field. (Tr., p. 644.) The 9mm Luger bullets recovered were all fired from the same firearm. (Tr., p. 645.)

{¶41} Zachary Bair began his testimony by admitting that he took D.B.'s life, and was testifying in this case as part of a plea agreement with the State. (Tr., pp. 654-655.) He was also charged with aggravated murder and murder with accompanying firearm specifications. (Tr., p. 654.) As part of his plea agreement, Bair would give truthful testimony in this case and plead guilty to manslaughter with a firearm specification. (Tr., pp. 701-702.) In exchange, the State would recommend 10 to 13½ years in prison. (Tr., pp. 701-702.)

{¶42} Bair stated that he did not previously know D.B., and the reason Bair shot him was "because of who I was with." (Tr., p. 656.) Bair testified that he and Appellant had gone to school together. (Tr., p. 657.) On the night in question, he wanted to purchase some "weed" so he "pulled up" to the house where Appellant was visiting. (Tr., pp. 658-659.) He stated that he was alone. (Tr., p. 659.) Bair knocked on the door and went in wearing a mask "[b]ecause it was cold outside." (Tr., p. 661.) Appellant was in the kitchen, and Bair was able to purchase his marijuana. (Tr., p. 662.)

{¶43} Because the drug was wrapped in plastic wrap, Bair took a knife from the kitchen to cut it open. (Tr., pp. 663-664.) He then put the knife in his pocket. (Tr., p. 664.) Bair identified the knife found in the field as the one he took from the kitchen. (Tr., p. 664; Exh. 83.)

**{¶44}** Bair then left with Appellant in a red Jeep, leaving his own car at the house. (Tr., p. 665.) Bair and Appellant spent some time driving around. (Tr., pp. 665-666.) The two drove around the south and west sides of Youngstown and met a few people to whom Appellant sold marijuana. (Tr., pp. 667-668.) Bair said he was carrying a loaded .45 Glock with him at the time. (Tr., pp. 668-669.) The Glock belonged to his friend Ezekiel. (Tr., p. 694.) Bair could not recall if Appellant had his phone with him at the time. (Tr., p. 671.)

**{¶45}** As the two drove down South Avenue toward the downtown area, Appellant pointed out a Chevy Cruze parked at the Shell station. (Tr., p. 674.) Appellant said, "there go that motherfucker right there." (Tr., p. 674.) Appellant drove past the Shell station and turned down the next street. (Tr., pp. 675-676.) They took another turn and parked the car in the driveway of a house on Samuel Street. (Tr., pp. 677-678.) Appellant then asked Bair if he "was with him" and pulled out a gun from his waistband. (Tr., pp. 678-679.) Bair understood this to mean they were going to "go down there and shoot [that] dude [who was in the car]." (Tr., pp. 679-680.) They got out of the car and walked to the Shell station with their guns in their hands. (Tr., pp. 682-683.) Bair said their intent was to "shoot the car up." (Tr., pp. 683-684.)

**{¶46}** As they approached the car, Bair could see someone sitting in it. (Tr., p. 685.) He testified that he and Appellant approached the car on the driver's side "and shot the car up." (Tr., p. 689.) Bair fired his weapon five or six times and then turned and ran. (Tr., p. 690.) He heard Appellant also fire shots. (Tr., pp. 690-691.) Bair dropped the knife he had taken from the kitchen while he was running. (Tr., p. 691.) He also dropped

his gun. (Tr., p. 695.) Bair stated Appellant was running with him. (Tr., p. 692.) When the two made it back to the Jeep, they left the scene. (Tr., pp. 697-698.)

{¶47} Appellant drove them back to the house and told Bair, "don't tell his girl then." (Tr., p. 699.) Bair got into his car and left. (Tr., p. 700.)

{¶48} Bair testified that he was wearing all black that night as was Appellant, and that they both wore masks. (Tr., pp. 686-687.) Bair identified himself and Appellant in a video taken from a security camera near the scene. (Tr., p. 688; Exh. 101.)

{¶49} When asked why he shot D.B., Bair responded, "because I was with him [Appellant]." (Tr., p. 701.) The prosecutor asked, "you do things for your friends?" and Bair responded, "If I'm with you. If I'm with you, yeah. I'm not proud of it." (Tr., p. 701.)

{¶50} Bair stated that he had only seen Appellant once after his arrest. (Tr., p. 704.) When Bair saw him, Appellant told Bair to "hold it down", which means to "be loyal." (Tr., p. 704.)

{¶51} On cross-examination, Bair admitted that he had not previously told police he went to Arelis's house for the purpose of purchasing marijuana. (Tr., pp. 717-718.)

{¶52} Dr. Elizabeth Mooney is the forensic pathologist who performed the autopsy on D.B.'s body. Dr. Mooney testified that D.B. suffered nine gunshot wounds, which were fired from at least two different firearms. (Tr., p. 790.) D.B.'s cause of death was multiple gunshot wounds. (Tr., p. 792.)

{¶53} Tyesha is Bair's ex-girlfriend. Tyesha testified that in January 2023, Bair gave her his car. (Tr., p. 822.) Her suspicions were not aroused at the time. (Tr., p. 822) But a few months later, the police confiscated the car. (Tr., pp. 822-823.)

**{¶54}** Darren is D.B.'s cousin. On the night of the shooting, Darren lived on Dixon Street, which is next to the Shell station where D.B. was shot. (Tr., p. 833.) Darren had several security cameras on his property. (Tr., p. 833.) On the night in question, D.B. was supposed to visit his house, but he never arrived. (Tr., p. 834.) Darren heard gunshots and went outside to see what was happening. (Tr., pp. 834-835.) He saw that a vehicle that looked like D.B.'s had been "shot up" in the gas station parking lot. (Tr., pp. 835-836.) As a result, Darren called several family members, including D.B.'s mother, looking for D.B. (Tr., p. 836.)

**{¶55}** Darren reviewed his security cameras. On the camera footage, he saw a red Jeep at approximately 2:16 a.m. (Tr., p. 843.) He then saw two figures walking down the street at 2:20 a.m., and those same figures running back from the gas station at 2:21 a.m. (Tr., pp. 843-844.)

**{¶56}** Austin Fedchock is a criminal intelligence analyst for BCI. He was able to analyze Arelis's and Appellant's cell phone records. He testified that Arelis's phone placed one call to Appellant's phone at 10:22 p.m. on December 21, 2022, and placed nine calls between 1:09 a.m. and 2:01 a.m. on December 22, 2022. (Tr., pp. 866-868.) Fedchock stated there was no duration to these calls, which indicated they were not answered. (Tr., p. 869.) The geolocation area for the cell tower these calls connected to was the Newport area of the south side of Youngtown, which was near Arelis's house. (Tr., p. 873.) This geolocation does not necessarily indicate the cell phone was stationary, just that the sector of the cell site is the one that provides the best quality of service to the mobile device. (Tr., p. 874.) During the time of the calls to Appellant's cell phone, the calls were bouncing off of the same tower on the south side. (Tr., pp. 876-879.)

**{¶57}** In his argument that the evidence does not support his convictions, Appellant first claims there are inconsistencies in Arelis's testimony, which he insinuates implicated Arelis in the murder instead of himself.

**{¶58}** Appellant cites to Arelis's testimony that D.B. had called her a few days prior to the murder. (Tr., p. 510.) While she could not recall the exact conversation, Arelis stated that she was offended by what D.B. said. (Tr., p. 511.) Appellant argues this established a motive for Arelis to murder D.B.

**{¶59}** Arelis's testimony in this regard was scant. She did not describe what D.B. said that had offended her. No further testimony on this subject was ever offered.

**{¶60}** Appellant next claims that Arelis's use of the word "they" to describe the visitor to her house that night implies that more than one individual came to her house with Bair. (Tr., pp. 461, 513.) And he highlights her testimony that the man who came to her house wore a face mask so she did not see his face, yet she also testified that she fed the man while he was at her home. (Tr., pp. 462, 530-531.)

**{¶61}** While Appellant claims that Arelis testified to more than one person showing up at her house, he misstates her testimony. This apparently stems from the following exchange:

> Q . . . At any point in that evening, did anyone come to your house that you didn't know?
>
> A Yes.
>
> Q And when and how did that happen?

A  They drove to my house.

Q  Okay.  When you say they - -

A  Well, he - -

Q  - - you're speaking of how many people?

A  One person.

(Tr., p. 461.)

{¶62}  Defense counsel repeatedly tried to get Arelis to testify that when she said "they" she meant that more than one person arrived at her home.  (Tr., pp. 524, 529, 537-538, 540.)  She corrected counsel each of these times.  It is disingenuous for Appellant to now argue otherwise.  Even if Arelis's testimony presented the jury with a slight discrepancy, it was up to the jury to determine whether Arelis was a credible witness and which part of her testimony was more, or less, believable.

{¶63}  Appellant takes issue with Arelis's testimony on the timing of events.  Arelis stated Appellant returned to her home between 1:00 and 2:00 a.m., which he asserts was before the murder occurred.  (Tr., pp. 473, 516-517.)  Appellant claims that Arelis called Officer Burton in order to create an alibi for herself at approximately 1:29 a.m.  (Tr., pp. 471-472.)

{¶64}  The evidence indicated that the shooting took place at approximately 2:20 a.m.  Arelis's phone records showed that she called Appellant's cell phone multiple times between 1:09 a.m. and 2:01 a.m.  While Arelis's testimony that Appellant returned to her

house between 1:00 and 2:00 a.m. appears to be slightly off, this was also a matter for the jury to consider in weighing Arelis's credibility.

{¶65} Appellant also takes issue with Arelis's testimony that he took her and her daughter's phone. Her actual testimony was that Appellant said he was taking the phones to her basement, and then she heard "a lot of ruckus" so she assumed he "smashed" them. (Tr., p. 478.) She later testified, however, that she made phone calls that morning. (Tr., pp. 479, 521-523.)

{¶66} Again, these alleged inconsistencies were matters for the jury to consider while determining if Arelis's testimony was truthful, whether her testimony was consistent, and which parts to believe if they discovered inconsistencies.

{¶67} Appellant also relies on the GPS records for his phone during the time of the murder. He claims the evidence showed that his phone never moved and he was not near the scene of the murder on the morning in question. (Tr., p. 917.)

{¶68} Bair testified that he was unsure whether Appellant had his phone with him when they were driving around before the murder. Both Arelis's and Appellant's phone records reflect that while Arelis called Appellant numerous times between the period after he left her house to the moment he returned, Appellant never answered his phone. Thus, it is possible that Appellant did not take his phone with him at the time. Moreover, the evidence does not prove, as Appellant suggests, that his phone never moved. The evidence only showed that Appellant's phone signal was "bouncing off" of the same cell tower, indicating the signal was strongest for his phone in that area.

{¶69} Ironically, Appellant states, "[t]he only evidence introduced by the State to establish Appellant's guilt is the uncorroborated testimony of [Arelis] . . . and co-defendant

Zachary Bair." (Appellant's Brf., p. 18.) However, he fails to recognize that these two witnesses corroborated each other's testimony. Thus, their testimony was not uncorroborated as Appellant claims.

**{¶70}** Whether to believe these two witnesses was a matter for the jurors to determine based on witness credibility. Although an appellate court is permitted to independently weigh the evidence including witness testimony, when determining whether a conviction is against the manifest weight of the evidence, we must give deference to the fact finder's determination of the witnesses' credibility. *State v. Jackson*, 2009-Ohio-6407, ¶ 18 (7th Dist.). The policy underlying this presumption is that the trier of fact is in the best position to view the witnesses and observe their demeanor, gestures, and voice inflections, and use these observations in determining the credibility of the proffered testimony. *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984).

**{¶71}** While no direct physical evidence connects Appellant to the murder, two witnesses identified Appellant as one of the two people who murdered D.B. One witness testified that he participated in the murder with Appellant. The other witness testified that Appellant, while visibly shaken, confessed to the murder shortly after it happened. If found credible by the jury, the testimony of these two witnesses clearly established Appellant shot and killed D.B., and the lack of physical evidence connecting Appellant to the murder does not render the jury's conviction against the manifest weight of the evidence.

**{¶72}** A conviction is not against the manifest weight of the evidence simply because there is no direct physical evidence linking the defendant to the crime. *See Jackson* at ¶ 16 ("If [the witness's] testimony is believed then the lack of fingerprints, DNA,

footprints or any other type of physical evidence does not render the conviction against the manifest weight of the evidence."); *State v. Peeples*, 2014-Ohio-4064, ¶ 21 (10th Dist.) ("a lack of physical evidence, standing alone, does not render appellant's conviction against the manifest weight of the evidence.").

{¶73} Accordingly, Appellant's second assignment of error is without merit and is overruled.

{¶74} Appellant's first assignment of error states:

THE TRIAL COURT IMPROPERLY EXCLUDED EVIDENCE THAT WOULD HAVE DIRECTLY IMPEACH[ED] LAW ENFORCEMENT OFFICERS FOR A LACK OF MEANINGFUL INVESTIGATION. THE COURT THEREBY VIOLATED THE RULES OF EVIDENCE, DEPRIVED APPELLANT OF DUE PROCESS OF LAW VIOLATING HIS RIGHTS TO PRESENT A MEANINGFUL DEFENSE, AND TO CONFRONT HIS ACCUSERS AS GUARANTEED BY THE SIXTH AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION AND ARTICLE 1, SECTION 10 OF THE OHIO CONSTITUTION.

{¶75} Officer Miller responded to the scene of the murder. He photographed the scene at the gas station, the items found in the field, and various items at Arelis's house.

{¶76} In cross examining Officer Miller, defense counsel asked if he was familiar with Conroy's Party Shop, which is located approximately 100 feet from Arelis's Judson Avenue home. (Tr., p. 397.) Counsel asked Officer Miller if he ever went to this shop to look for any surveillance video which may exist and may be relevant to this case. The

officer responded that he had not. (Tr., p. 397.) Counsel then showed Officer Miller several photographs depicting the outside of the shop and what looks to be a "ring camera," or some type of security doorbell, by the shop's door. (Tr., p. 397; Exhs. E, F, G, H, I, J.) The prosecutor then asked to approach the bench. (Tr., p. 397.) An off-the-record conversation ensued between the court and counsel. (Tr., p. 397.) Once cross examination continued, Officer Miller again stated that he never went to this shop to check for the existence of any security footage. (Tr., p. 398.)

{¶77} Later, the court and counsel discussed these proposed exhibits on the record. The court told defense counsel it had not complied with Mahoning County Local Rule 9, which requires all exchanges of supplemental discovery to be completed no later than seven days before trial. (Tr., pp. 449-450.) The rule further provides that matters offered in violation of the rule shall not be used at trial without leave of court for good cause shown. (Tr., p. 450.) The judge stated it would provide defense counsel with the opportunity to convince the judge why there was good cause to allow the photographs to be admitted at a later time. However, the issue was never again addressed.

{¶78} In his appellate brief, Appellant contends defense counsel did not take these particular photographs until the eve of trial. (Appellant's Brf., p. 14.) Appellant now argues he attempted to introduce these exhibits in order to demonstrate some failure to conduct a proper investigation by law enforcement. He claims the "trial Court formally sustained the objection and prevented Appellant from introducing the exhibits" citing pages 449-450 of the transcript. (Appellant's Brf., p. 16).

{¶79} Appellant, however, misstates what actually occurred at trial. The court never "formally sustained the objection and prevented Appellant from introducing the

exhibits" as he claims. Instead, court and defense counsel engaged in the following exchange:

THE COURT: Counsel, two issues that we talked about during the side bars. One was the photographs coming in and being used, not as evidence, but perhaps, but surely to cross examine. And our local rule is Rule 9, and it says, all exchanges of supplemental discovery shall be completed no later than seven days before trial. Matters not provided by either side to the other in violation of the rule shall not be used at trial without leave of Court for good cause shown.

So I think we are at the for good cause shown point because it wasn't provided within seven days. I will give you the opportunity at some point either later today or tomorrow morning to convince me why there's good cause why I should let those in.

[Defense Counsel]: I'll give the Court - - address that, and I'll also address just the issue with attorney work product. I understand there's local rules, but, you know, the Rules of Evidence trump that. If something is attorney work product that I prepared, that we each have equal access to, I believe that it would trump that local rule. But I will find the Court some case law to support that by tomorrow.

THE COURT: And I didn't look up the work product, so yeah, that would be great if you want to present that to me tomorrow. I'm going to try to look it up, if I can.

(Tr., pp. 449-451.)

{¶80} This record reveals, however, that the issue was not again raised by either defense counsel or the court. When the court asked defense counsel at the end of the presentation of evidence if he had any exhibits to present, counsel stated that he did not. (Tr., p. 971.)

{¶81} Based on the record, Appellant has waived this issue on appeal. As can be seen from the above excerpt, the trial court reserved its final ruling on the issue pending the presentation of caselaw and further argument by defense counsel expected the following day. Counsel was to report back to the court the next morning with any support for the admission of the exhibits. He failed in this regard.

{¶82} Under the invited error doctrine, a party may not "take advantage of an error which he himself invited or induced." *State v. Davis*, 2008-Ohio-2, ¶ 86, quoting *Hal Artz Lincoln-Mercury, Inc. v. Ford Motor Co.*, 28 Ohio St.3d 20, (1986), paragraph one of the syllabus. Defense counsel should have brought this issue to the court's attention the next day as they had discussed. Failure to do so results in waiver of this issue for appellate purposes.

{¶83} Accordingly, Appellant's first assignment of error is without merit and is overruled.

{¶84} Appellant's third assignment of error states:

Case No. 25 MA 0097

APPELLANT WAS DEPRIVED OF A FAIR TRIAL IN VIOLATION OF DUE PROCESS OF LAW IN VIOLATION OF THE FIFTH, SIXTH, AND FOURTEENTH AMENDMENT[S] TO THE UNITED STATES CONSTITUTION AND ARTICLE 1, SECTION 10 OF THE OHIO CONSTITUTION.

{¶85} Appellant contends in this assignment that the trial court should not have allowed the introduction of prior bad acts evidence. Specifically, Appellant takes issue with the admission of evidence that: (1) he was previously arrested for a firearm offense with D.B., and (2) he was involved in the sale of marijuana immediately before the murder.

{¶86} The admission or exclusion of evidence is within the trial court's broad discretion and this court will not reverse its decision absent an abuse of that discretion. *State v. Mays*, 108 Ohio App.3d 598, 617 (8th Dist. 1996). Abuse of discretion connotes more than an error of judgment; it implies that the trial court's judgment was unreasonable, arbitrary, or unconscionable. *State v. Adams*, 62 Ohio St.2d 151, 157 (1980).

{¶87} Regarding Appellant's prior firearm offense, Appellant begins by noting that the State filed a notice of intent to use other acts evidence prior to trial. This notice contained the information that the State would seek to admit testimony that Appellant and D.B. had both been charged with improperly handling a firearm in a motor vehicle in 2021. Further, to establish motive in this case, the State intended to elicit testimony that Appellant had admitted the gun involved was his so that the charges would be dismissed against D.B.

**{¶88}** In a pretrial interview, Arelis had revealed that Appellant told her he killed D.B. because Appellant "took a gun charge" for D.B. During trial, the State asked D.B.'s girlfriend Ebony whether something happened that caused D.B. to be sent back to prison. Ebony responded, "[y]es. It was around Thanksgiving, in November 2021. [Appellant] and [D.B.], they had got - -". (Tr., p. 433.) Appellant objected on the basis of hearsay. (Tr., p. 433.) The court asked the prosecutor to add another question. (Tr., p. 435.) The prosecutor then asked Ebony how she became aware D.B. went back to prison. (Tr., p. 435.) She responded that she knew because she was his girlfriend and they were living together at the time. (Tr., p. 435.) The prosecutor asked Ebony what she was aware of. (Tr., p. 436.) Appellant objected on the basis of hearsay. (Tr., pp. 436-437.) The court stated that it would allow Ebony's testimony "until there's a point where I think she may be crossing the line into hearsay." (Tr., p. 437.)

**{¶89}** At this juncture, Appellant's counsel stipulated:

[Defense Counsel]: I mean, I think we can stipulate. I think we can stipulate obviously that [D.B.] and my client got arrested, I believe, November of 2021 in a vehicle and there was a - - firearms in the car. Is that the purpose of this?

[Prosecutor]: That's where I was trying to go.

[Defense Counsel]: We can stipulate to that. Yeah, that's not a problem.

(Tr., p. 437.)

**{¶90}** Appellant now claims his counsel's stipulation was intended to limit Ebony's testimony because counsel believed the evidence would be admissible to establish motive later. However, as Appellant points out, the State changed its trial strategy and instead of positing that Appellant had taken the blame for an earlier crime to allow D.B. to go free, now suggested that Appellant's motive for killing D.B. was that D.B. had stolen money from Appellant.

**{¶91}** Despite this contention, Appellant has waived this issue on appeal due to his stipulation at trial. The Third District explained the effect of a stipulation on an appellate review:

> "A stipulation is a voluntary agreement between opposing counsel concerning disposition of some relevant point so as to obviate the need for proof or to narrow the range of litigable issues." *State v. Easterling*, 2d Dist. 2019-Ohio-2470, —— N.E.3d ——, ¶ 66 (2d Dist.), quoting 89 Ohio Jurisprudence 3d, Trial § 60. "Pursuant to [the] doctrine [of invited error], a party cannot claim that a trial court erred by accepting the party's own stipulation." *State v. Richey*, 2018-Ohio-3498, 118 N.E.3d 1147, ¶ 61 (10th Dist.), quoting *State v. McClendon*, 10th Dist. Franklin No. 11AP-354, 2011-Ohio-6235, ¶ 37.

*State v. Harvey*, 2020-Ohio-329, ¶ 51 (3d Dist.).

**{¶92}** Appellant also takes issue with testimony regarding his marijuana sales. Bair gave an account of what he and Appellant were doing leading up to the time of the murder. He stated that he went to Arelis's house because Appellant was there and he

intended to buy some "weed" from Appellant. (Tr., p. 658.) Appellant's counsel did not object. A bit later in his testimony, Bair stated that he purchased a pound of marijuana from Appellant. (Tr., p. 662.) This time Appellant's counsel did object, but he immediately withdrew the objection. (Tr., pp. 662-663.)

{¶93} Bair testified that he got into a Jeep with Appellant and the two drove around the west and south sides of Youngstown. (Tr., pp. 665-667.) He stated they met two or three people when Appellant stopped and sold marijuana to them. (Tr., pp. 667-668.) Counsel did not object to this testimony either.

{¶94} Bair said they drove around for a few hours. (Tr., p. 670.) Eventually, they headed down South Avenue. (Tr., p. 673.) Bair stated that Appellant pointed out a Chevy Cruze at a Shell gas station and told Bair "there go that motherfucker right there." (Tr., pp. 674-675.) They subsequently drove around the corner and parked in a driveway at a house behind the gas station. (Tr., p. 676.)

{¶95} At the conclusion of its direct examination, the prosecutor asked Bair how much Bair paid Appellant for the marijuana that night. (Tr., p. 705.) Bair said he paid $900 or $1,100. (Tr., p. 705.) Following this answer, the judge mentioned an issue with its docket and took a brief recess. (Tr., p. 706.) After this recess, the judge noted that defense counsel wanted to address an issue on the record. Appellant's counsel then said that the State never gave notice Bair was going to testify that Appellant made several marijuana sales that night. (Tr., p. 707.) The prosecutor responded that defense counsel failed to lodge an objection during this testimony, when it could have easily been addressed by the court. (Tr., p. 709.) The court stated it would consider the matter and issue a jury instruction regarding this issue if it concluded a corrective jury instruction was

warranted. (Tr., pp. 709-710.) The court did not give a jury instruction regarding this matter.

{¶96} On cross-examination, defense counsel spent a great deal of time questioning Bair about whether he mentioned the marijuana sales in his prior statement. (Tr., pp. 718, 720-723.) Clearly, counsel was making the inference that Bair had not described the marijuana sales previously in an attempt to impeach Bair's credibility with the jury.

{¶97} The issue was not again raised until after the jury had begun deliberating. Defense counsel sought to have a mistrial declared, arguing Appellant was prejudiced by Bair's testimony that Appellant "was driving around selling pounds of weed." (Tr., p. 1101.) The prosecutor responded that the evidence was offered to show the events leading up to the murder, and what Appellant and Bair were doing that night. (Tr., p. 1104.) The court denied Appellant's motion.

{¶98} Generally, relevant evidence is admissible. Evid.R. 402. "Relevant evidence" is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401.

{¶99} Pursuant to Evid.R. 404(B), evidence of prior bad acts is inadmissible to prove the accused acted in conformity with his bad character. *State v. Treesh*, 90 Ohio St.3d 460, 482 (2001). But evidence of other crimes, wrongs, or acts can be admissible to demonstrate motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, lack of accident. Evid.R. 404(B).

{¶100} Appellant failed to object to the testimony he now takes issue with. Failure to object at trial to the admission of evidence waives all subsequent arguments, except for plain error. *State v. Patel*, 2004-Ohio-1553, ¶ 69 (7th Dist.), citing *State v. Jones*, 2001-Ohio-57. There is no plain error unless, but for the error, the outcome of the trial would have been different. *Id.* citing *State v. Joseph*, 1995-Ohio-288. We note that courts must exercise notice of plain error with great caution, "under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Landrum*, 53 Ohio St.3d 107, 111 (1990), quoting *State v. Long*, 53 Ohio St.2d 91, 98 (1978), paragraph three of the syllabus.

{¶101} It is apparent from this record that the outcome of Appellant's trial would not have been different if the evidence regarding his marijuana sales had been excluded. The State presented two witnesses who testified that Appellant committed the murder. One was a co-defendant eyewitness and the other Appellant had confessed to shortly after committing the murder. The jury's determination in this case hinged on whether they found these two witnesses were credible. Whether Appellant made a few marijuana sales earlier in the evening had no effect on this determination.

{¶102} Additionally, the State did not offer the evidence of Appellant's marijuana sales in an attempt to prove that Appellant acted in conformity with his bad character. This testimony was part of a narrative provided by Bair as to how the night progressed from the time he arrived at Arelis's house until after the murder was committed.

{¶103} Bair testified that he went to Arelis's house because Appellant was there and he wanted to purchase marijuana from Appellant. (Tr., pp. 658, 662-663.) Defense counsel initially objected but then immediately withdrew this objection. (Tr., pp. 662-663.)

Bair next explained that he took a kitchen knife from Arelis's butcher block to cut open the package of marijuana, which was wrapped in plastic wrap, and stuck the knife in his pocket. (Tr., pp. 663-664.) This testimony was used to explain how and why Bair possessed a knife from Arelis's kitchen, which was later found in the field after the murder.

{¶104} Bair went on to describe their whereabouts after leaving Arelis's house. He testified the pair were driving around the west and the south sides of Youngstown. (Tr., pp. 666-667.) Bair said that while they were driving, they met some people, Appellant sold some "weed", and they stopped by the Coconut Grove bar. (Tr., pp. 667-668, 672.) He did not elaborate on Appellant's marijuana sales; it was simply part of his explanation of the night's events. Once again, Appellant did not object to this testimony.

{¶105} When evidence is not offered to prove the defendant acted in conformity with some prior bad action and instead "merely set[s] the stage", its exclusion is not required under Evid.R. 404(B). *State v. Hicks*, 2004-Ohio-5223, ¶ 24 (8th Dist.).

{¶106} Finally and significantly, in addition to failing to object to the above testimony, defense counsel spent considerable time on cross examination discussing Appellant's marijuana sales and using prior inconsistencies in Bair's statements in an attempt to impeach his credibility:

Q Okay. And I believe you said that you go into this house and you're going to buy weed, correct? You said a pound, correct?

A Yes.

Q   Whenever you testified under oath, which is what you're doing today, did you indicate that you were there to buy a pound from my client? Did you say that?

A  When, today?

Q  No, August 27th of last year.  Did you say that?

A  They didn't ask me that.

Q  They asked you why you were there, correct?

A  Yeah.

Q  Did you ever tell the Court or the court reporter that you were there because you bought a pound from my client?

A  I don't remember.

(Tr., pp 717-718.)

**{¶107}**  Defense counsel then provided Bair with a transcript of his prior testimony and continued:

Q   Do you see in here where you ever indicated that you bought a pound from my client?

A  I don't see it on the paper.

Q  Because you didn't say it, correct?

A  I guess I didn't say it.

(Tr., p. 718.)

{¶108}  Defense counsel then moved on to Bair's testimony regarding the other marijuana sales.  Counsel used this testimony in an effort to show that Appellant must have had his cell phone with him and, consequently, his cell phone signal should have been bouncing off of cell phone towers in different parts of town:

Q  Have you ever sold drugs before?

A  Yes.

Q  Do you need a cell phone to set up a drug transaction typically?

A  Typically.

Q  If you're driving around to the west side, Northfield [sic], and you're selling drugs to all these people, would not you need a cell phone?

A  You would have to arrange it.

Q   And you were with my client that night, you said you went to multiple - - so you start on the south side, correct?  Said you drove around for hours, correct?

A  Yes.

Q  You were on the west side, correct?

A  Yes.

Q  Where else are you at?

A  Between the south side and the west side.

. . .

Q  And my client had a phone because, according to you, he's setting up drug transactions, correct?

A  I didn't say that.

Q  You don't think he had a phone on him?

A  I mean, I'm assuming - - I'm pretty sure he had a phone, I don't know if he had it on him.

Q  So if he had a phone on him, his GPS signal is going to be bouncing off of these towers and we are going to see exactly where his phone's going, correct?

A  Yeah.

(Tr., pp. 720-722.)

{¶109}  It is quite plausible that the reason defense counsel did not object to Bair's testimony regarding Appellant's marijuana sales is because counsel believed this testimony could be useful to the defense.  Not only did trial counsel fail to object to the

Case No. 25 MA 0097

purported other-acts evidence, counsel used the other-acts evidence as part of its defense.

{¶110} Defense counsel drove home the point that Bair did not say that he went to Arelis's house to purchase marijuana from Appellant when he first gave a statement prior to trial. Counsel used this evidence to raise an inconsistency with Bair's trial testimony in another attempt to impeach Bair's credibility. And defense counsel used Bair's testimony regarding driving around town with Appellant making marijuana sales to raise questions about the cell tower evidence and any conclusions which the jury may draw regarding where he was on the night of the murder. Obviously, Appellant now takes issue with defense counsel's trial strategy.

{¶111} Courts have found that when defense counsel uses prior bad acts evidence introduced by the State as part of their defense strategy, any error in admitting that evidence is invited error. See *State v. Bradshaw*, 2023-Ohio-1244, ¶ 26 (3d Dist.) (counsel used these additional alleged instances of sexual abuse to undermine witness's credibility); *State v. C.D.S.*, 2021-Ohio-4492, ¶ 46 (10th Dist.) ("to the extent the trial court erred by allowing the other-acts evidence, Bradshaw's counsel utilized the error as part of the defense strategy, effectively making it invited error").

{¶112} Thus, there was no error here and even assuming there was, under the doctrine of invited error Appellant has waived this issue.

{¶113} For all of the above reasons, Appellant's third assignment of error is without merit and is overruled.

{¶114} Appellant's fourth assignment of error states:

APPELLANT WAS DENIED A FAIR TRIAL BY A PANEL OF IMPARTIAL JURORS IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENT[S] OF THE UNITED STATES CONSTITUTION AND ARTICLE 1, SECTION 10 OF THE OHIO CONSTITUTION.

**{¶115}** On September 18, 2025, Appellant filed a motion for a new trial on the basis of newly discovered evidence.  In support of this motion, Appellant attached the affidavit of Juror 8.  The affidavit contained Juror 8's observations about various aspects of the jury deliberations, including alleged threatening behavior from other jurors.  The court held a hearing on the motion on November 6, 2025.  The focus of this hearing was the timeliness of the motion.  The parties and the court discussed whether the motion was based on jury misconduct, under which Appellant had 14 days from the jury verdict to timely file.  Crim.R. 33(A)(2), (B).  Appellant insisted that his motion for new trial was based on newly discovered evidence, for which he had 120 days to file.  Crim.R. 33(A)(6), (B).  Appellant then argued the merits of the motion and attempted, without success, to have the court allow Juror 8 to testify about the alleged threatening remarks and other aspects of the deliberations.  The hearing was continued to November 17, 2025 for the court and the parties to conduct further research as to the timing of the motion.

**{¶116}** At the continued hearing, the judge made it clear that the only issue being reviewed was whether Appellant could provide clear and convincing proof that he was unavoidably prevented from filing the motion for new trial within 14 days of the jury verdict, since both parties had agreed that it was not filed within that time.  Appellant's counsel once again attempted to argue the merits of the motion rather than directly addressing its tardiness.  At the end of the hearing the court determined that the basis for the motion

was juror misconduct, not newly discovered evidence. (11/17/25 Tr., p. 43.) The court held that a motion for new trial based on juror misconduct must be filed within 14 days of the jury verdict. The court held that in order to avoid dismissal of the untimely motion Appellant was required to present clear and convincing evidence as to why he was unavoidably prevented from timely filing. (11/17/25 Tr., p. 44.) The court found Appellant offered no evidence to demonstrate that he was unavoidably prevented from timely filing. (11/17/25 Tr., p. 44.) In fact, the court opined there was no evidence that Appellant could have presented, given that the issue of juror misconduct was addressed during the trial. (11/17/25 Tr., p. 44.) The court denied Appellant's motion at the end of the hearing and filed its judgment entry on November 25, 2025.

**{¶117}** A trial court ruling on a motion for new trial in a criminal case is reviewed for abuse of discretion. *State v. Rivers*, 2024-Ohio-4868, ¶ 52 (7th Dist.). "Abuse of discretion means an error in judgment involving a decision that is unreasonable based upon the record; that the appellate court merely may have reached a different result is not enough." *State v. Dixon*, 2013-Ohio-2951, ¶ 21 (7th Dist.). When applying the abuse of discretion standard, the reviewing court may not simply substitute its own judgment for that of the trial court. *State v. Schulman*, 2020-Ohio-4146, ¶ 23 (10th Dist.), citing *Pons v. Ohio State Med. Bd.*, 66 Ohio St.3d 619, 621 (1993).

**{¶118}** Crim.R. 33 governs motions seeking new trial. It provides, in relevant part:

(A) Grounds. A new trial may be granted on motion of the defendant for any of the following causes affecting materially the defendant's substantial rights:

. . .

(2)  Misconduct of the jury, prosecuting attorney, or the witnesses for the state;

. . .

(6)  When new evidence material to the defense is discovered which the defendant could not with reasonable diligence have discovered and produced at the trial.  When a motion for a new trial is made upon the ground of newly discovered evidence, the defendant must produce at the hearing on the motion, in support thereof, the affidavits of the witnesses by whom such evidence is expected to be given, and if time is required by the defendant to procure such affidavits, the court may postpone the hearing of the motion for such length of time as is reasonable under all the circumstances of the case.  The prosecuting attorney may produce affidavits or other evidence to impeach the affidavits of such witnesses.

(B)  Motion for New Trial; Form, Time.  Application for a new trial shall be made by motion which, except for the cause of newly discovered evidence, shall be filed within fourteen days after the verdict was rendered, or the decision of the court where a trial by jury has been waived, unless it is made to appear by clear and convincing proof that the defendant was unavoidably prevented from filing his motion for a new trial, in which case the motion shall be filed within seven days from the order of the court finding

that the defendant was unavoidably prevented from filing such motion within the time provided herein.

Motions for new trial on account of newly discovered evidence shall be filed within one hundred twenty days after the day upon which the verdict was rendered, or the decision of the court where trial by jury has been waived. If it is made to appear by clear and convincing proof that the defendant was unavoidably prevented from the discovery of the evidence upon which he must rely, such motion shall be filed within seven days from an order of the court finding that he was unavoidably prevented from discovering the evidence within the one hundred twenty day period.

Crim.R. 33(A)(B).

{¶119} A motion for a new trial must be made within 14 days of the verdict, with two exceptions: (1) if the basis of the motion for a new trial is "newly discovered evidence", then the time period to file a motion for new trial is 120 days; or (2) if clear and convincing proof exists that the defendant was unavoidably prevented from filing his motion for a new trial within 14 days, then the motion shall be filed within seven days from the order of the court finding the defendant was unavoidably prevented from filing the motion within the time requirement. Based on Crim.R. 33, the state argued Appellant's motion for a new trial was untimely because it was based on jury misconduct and he did not file it within 14 days of the verdict.

{¶120} The verdict was rendered on August 18, 2025. The motion was filed on September 18, 2025, and so, was clearly filed more than 14 days after the verdict. Neither

party denies this, and they agreed about this at the November 17, 2025 hearing. (Tr., p. 3.) Appellant argued at both the November 6 and November 17, 2025 hearings that the motion was based on newly discovered evidence and he had 120 days to file the motion. When the trial court made it absolutely clear that the only issue under discussion at the November 17, 2025 continued hearing was whether Appellant was unavoidably prevented from filing the motion within 14 days of the verdict, his counsel inexplicably expressed surprise and stated: "I think first we weren't on notice of that." (11/17/25 Tr., p. 14.)

**{¶121}** There is no question that Appellant's contention his motion for new trial was based on newly discovered evidence, and thus was timely filed, is without merit. "The term 'newly discovered evidence,' as used in [Crim.R. 33(B)], does not refer to evidence of juror misconduct." *State v. Schiebel*, 55 Ohio St.3d 71, 76 (1990). In *Schiebel* the defendant made the same argument as Appellant: that uncovered evidence of juror misconduct constitutes newly discovered evidence pursuant to Crim.R. 33. *Schiebel* unequivocally rejected that argument and upheld the trial court's dismissal of the motion for new trial on the grounds that it was filed late and there was no clear and convincing evidence that the defendant was unavoidably prevented from timely filing. The parties and the trial judge in the instant case discussed the *Schiebel* case at the motion hearing, but Appellant has not cited to it or addressed it on appeal. *Schiebel* remains good law and is determinative of this assignment of error.

**{¶122}** A close examination of the record shows how committed Appellant was to the idea that his motion to dismiss was based on newly discovered evidence rather than juror misconduct. Appellant's argument at the November 6, 2025 hearing on the motion

Case No. 25 MA 0097

was that he did not need to prove that he was unavoidably prevented from filing the motion because it was a motion based on newly discovered evidence and he had 120 days to file the motion. Defense counsel stated: "Your Honor, the issue we are addressing right now is time limits. I think, clearly this is newly discovered, there's no question about that." (11/6/25 Tr., p. 5.) Defense counsel repeats this argument again and again at the hearing. (11/6/25 Tr., pp. 3, 4, 5, 6, 7, 8, 12, 23.)

{¶123} In the continued motion to dismiss hearing on November 17, 2025, the trial judge explained that Appellant did not and could not show that he was unavoidably prevented from filing the motion on time because the very issues raised in the motion to dismiss were raised and discussed at the trial. During jury deliberations, Juror 8 asked if he could speak with the judge. (Tr., p. 1115.) After a discussion with the jury about lunch preparations, the judge returned the jury to the jury room except for Juror 8. (Tr., p. 1125.) Juror 8 told the judge of potential juror misconduct in that he alleged certain other jurors were trying to have him removed from the jury, and they were pressuring and threatening him. (Tr., p. 1127.) Juror 8 then told the judge he could not continue to serve on the panel. (Tr., p. 1128.) The judge briefly spoke to each juror individually. (Tr., pp. 1133-1158.) Appellant's counsel raised an objection regarding one juror potentially threatening another. (Tr., p. 1135.) After all the jurors were interviewed, the court asked counsel to make a more thorough record of the allegations of Juror 8. (Tr., p. 1160.) When the court again interviewed Juror 8, he repeated that he could no longer serve on the jury. (Tr., p. 1166.) The judge then released Juror 8 and replaced him with Juror 13. (Tr., p. 1169.) Appellant's counsel once again objected, claiming the court should inquire further into which juror was responsible for the alleged threats. (Tr., p. 1173.)

{¶124} The transcript of the hearing on Appellant's motion for new trial shows that counsel was fully aware of alleged jury misconduct at trial, discussed the potential impact of the alleged misconduct, and even raised objections as to how the trial court conducted the matter. Appellant used these same allegations in the motion to dismiss on grounds of jury misconduct. Counsel admitted that he knew about the alleged intimidation of a juror at trial. (11/17/25 Tr., p. 39.) Counsel stated that the discussions and proceedings regarding juror misconduct were part of their motion seeking new trial. (11/17/25 Tr., p. 40.) Thus, the record supports the trial court's conclusion that it was impossible for Appellant to show he was somehow unavoidably prevented from filing the motion on time since he knew of the allegations at trial, and the trial transcript itself formed a basis for the motion.

{¶125} Appellant's fourth assignment of error is without merit and is overruled.

### Conclusion

{¶126} Appellant argues on appeal of his conviction and sentence for aggravated murder that his conviction was against the manifest weight of the evidence, but the evidence fully supports the conviction. Appellant argues that the trial court should not have excluded evidence that could have shown that the police did not conduct a thorough investigation, but Appellant has waived this issue on appeal under the invited error rule. He argues that the trial court failed to exclude prior bad acts evidence regarding his possession of a gun and selling marijuana. This argument fails for multiple reasons, including waiver for stipulating to the evidence, failure to object, and lack of prejudice. Finally, Appellant argues that the trial court should not have denied his motion for a new trial, but the motion was untimely. Appellant did not and could not show that he was

Case No. 25 MA 0097

unavoidably prevented from filing the motion on time. Since he failed to meet the exception to dismissal of his motion, it was appropriately dismissed. Appellant's assignments of error are overruled and the conviction and sentence are affirmed.

Hanni, J. dissents with dissenting opinion.

Dickey, J. concurs.

Hanni, J., dissenting.

{¶127} With regard and respect to my colleagues, I must dissent in part from the majority opinion.

{¶128} I agree with the majority that Appellant's conviction is not against the manifest weight of the evidence and the trial court did not make improper evidentiary rulings. Therefore, I too agree Appellant's conviction and sentence should be affirmed.

{¶129} But I would find the trial court prematurely determined Appellant's motion for a new trial was untimely. I would reverse the trial court's judgment denying the motion for new trial as untimely and would remand the matter for a hearing on the motion for new trial where Appellant would be permitted to present the testimony of Juror 8.

{¶130} The jury rendered its verdict in this case on August 18, 2025. Appellant filed the motion for a new trial on September 18, 2025, 31 days after the verdict. The parties then debated whether it was proper for the court to hear testimony from Juror 8, whom Appellant had subpoenaed. After hearing extensively from the parties, the court continued the hearing so that it could research the issues.

{¶131} The hearing reconvened on November 17, 2025. The court heard extensive arguments from both parties. The court noted the parties agreed that the motion was filed 31 days after the verdict. (Nov. 17, 2025 Tr. 43). So it was not filed within the 14-day time limit set out in Crim.R. 33(B). Next, it determined that the basis for the motion was juror misconduct, not newly discovered evidence. (Nov. 17, 2025 Tr. 43). Therefore, the court found that Appellant had to present clear and convincing evidence as to why he was unavoidably prevented from timely filing the motion. (Nov. 17, 2025 Tr. 44). The court found there was no evidence presented to demonstrate this. (Nov. 17, 2025 Tr. 44). In fact, the court opined there was no evidence that Appellant could have

presented given that the issue of juror misconduct was addressed during the trial. (Nov. 17, 2025 Tr. 44). The court then denied the motion for a new trial on the basis of untimeliness.

{¶132} Appellant's motion for a new trial could be considered timely by operation of the provision stating:

> unless it is made to appear by clear and convincing proof that the defendant was unavoidably prevented from filing his motion for a new trial, in which case the motion shall be filed within seven days from the order of the court finding that the defendant was unavoidably prevented from filing such motion within the time provided herein.

Crim.R. 33(B).

{¶133} Appellant did not ask the court for leave to file a motion for a new trial based on being unavoidably prevented from filing his motion within the 14-day period. The State argues the trial court could have denied the motion on this basis alone. But the trial court gave counsel the opportunity to argue that they were "unavoidably prevented" from filing the motion within the allotted time at the November 17, 2025 hearing. (Nov. 17, 2025 Tr. 13). The court, however, instructed that Appellant could not call a juror to testify in support. (Nov. 17, 2025 Tr. 14). Appellant's counsel argued that the biggest issue raised in the motion was the allegation that Juror 12 conducted his own independent research in the jury room regarding cell phone towers and presented the information to the other jurors. (Nov. 17, 2025 Tr. 20-21). Counsel stated that they were

not aware of this information until they hired an investigator, tracked down the jurors, and learned this information, which took longer than 14 days. (Nov. 17, 2025 Tr. 20-21).

**{¶134}** This assignment of error turns on whether Juror 8's testimony may have shed some light on if counsel were unavoidably prevented from filing the motion for a new trial within the 14-day time limit. If Juror 8 could have provided testimony relevant to the issue of whether counsel were unavoidably prevented from filing the motion for a new trial within the 14-day time limit, then the trial court should have permitted him to testify at the hearing on the motion for new trial. Counsel had subpoenaed Juror 8 and he was available at the hearing to testify. Because he was not permitted to testify, the court could not have been certain whether Juror 8 could have provided testimony relevant to this issue. Thus, I would find the trial court acted unreasonably and abused its discretion by not permitting defense counsel to question Juror 8 during the motion for new trial hearing.

**{¶135}** This is a case where procedure should not overcome substance. Defense counsel had subpoenaed Juror 8 and he was present at the hearing and ready to testify. The court had to determine whether defense counsel was unavoidably prevented from filing the new trial motion within 14 days of the verdict. Defense counsel stated that they were not aware of the allegations that Juror 12 conducted his own independent research regarding cell phone towers and presented this information to the jury until they hired an investigator, tracked down the jurors, and learned this information, which took longer than 14 days. It is possible that Juror 8's testimony may have shed some light on the issue and supported defense counsel's claims. As such, I would find the trial court should have allowed Juror 8 to testify before rendering its ultimate decision on the timeliness of the motion for a new trial.

Case No. 25 MA 0097

_____

For the reasons stated in the Opinion rendered herein, Appellant's assignments of error are overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Mahoning County, Ohio, is affirmed.  Costs waived.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure.  It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**